UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| **CIGNA HEALTH AND LIFE INSURANCE COMPANY,** ) | ) |
| Plaintiff, ) | ) |
| v. ) | **Civil Action Number** _____ |
| ) | **Jury Demand** |
| **LAURIE S. LEE, in her official capacity as Executive Director of the Department of Finance and Administration (Benefits Administration) for the State of Tennessee, and JOHN and JANE DOES 1-100, in their official capacities as Employees of the State of Tennessee,** ) | ) |
| Defendants. ) | ) |

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING ORDER**

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff CIGNA Health and Life Insurance Company ("Cigna" or Plaintiff) respectfully submits that its Motion for Temporary Restraining Order should be granted.

**I. INTRODUCTION AND BACKGROUND**

Cigna brings this motion to protect Tennessee consumers and businesses from anticompetitive harms that, in the absence of a temporary restraining order, will lead to a less healthy Tennessee -- higher prices, less quality, and reduced services for its citizens. The facts relevant to the issue before the Court are set forth in the Complaint and the contemporaneously filed Declaration of Matthew T. Ungs, the Vice President of Network Management for Cigna. Those filings are incorporated by reference. In sum, the Defendants, who are all employees of

the State of Tennessee ("the State Employee Defendants") have agreed, at the request of Representative Martin Daniel ("Daniel") (a Tennessee House member), that they will produce to Daniel (and thereby make public) an enormous quantity of Cigna's confidential, proprietary, sensitive, and trade secret business data ("Confidential Information"). The State Employee Defendants have indicated that they will do so on or about December 16, 2019. Upon information and belief, Daniel's request comes at the behest of a competitor of Cigna, and Cigna's Confidential Information (and potentially that of other health plan administrators under contract with the State) will be turned over to that competitor once the State Employee Defendants disclose it.

Cigna seeks a temporary restraining order under Federal Rule of Civil Procedure 65 to prevent that disclosure to Daniel. The planned disclosure of Cigna's Confidential Information, while purportedly sought by Daniel pursuant to state open records laws or other state sunshine laws ( "Open Records Laws"), would violate the Sherman Act and Cigna's rights under the Fifth Amendment to the Constitution (as applied to the states through the Fourteenth Amendment), legal constructs that clearly trump any claim of obligation under a state open records law.[1] *Collins v. Virginia*, 138 S. Ct. 1663, 1678 (2018) ("Federal law trumps state law only by virtue of the Supremacy Clause, which makes the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties . . . the supreme Law of the Land," Art. VI, cl. 2");

---

[1] Indeed, this case is brought under the doctrine of *Ex parte Young*, through which Cigna has sued officers acting on behalf of the state for ongoing violations of federal law, and Cigna seeks only equitable, prospective relief. *Westside Mothers v. Haveman*, 289 F.3d 852, 862, (6th Cir. 2002) ("Under the doctrine developed in Ex parte Young and its progeny, a suit that claims that a state official's actions violate the constitution or federal law is not deemed a suit against the state, and so barred by sovereign immunity, so long as the state official is the named defendant and the relief sought is only equitable and prospective. . . . Plaintiffs seek only prospective injunctive relief from a federal court against state officials for those officials' alleged violations of federal law, and they may proceed under Ex parte Young.").

*United States v. Napier*, 233 F.3d 394, 404 (6th Cir. 2000) ("any state law that conflicts with federal law is without effect") (quotations omitted).

As explained in the Complaint and the Declaration of Matthew T. Ungs, Cigna is a provider of administrative services to employer-sponsored health benefit plans, among other places, in the State of Tennessee. (Ungs Decl. at ¶ 2). Cigna contracts with the State of Tennessee ("State") to administer health and wellness plans sponsored by the State of Tennessee. (*Id.* at ¶ 3). Administration of these health and wellness plans is comprehensive, including customer and member support, and claims administration. (*Id.* at ¶ 3).

In the course of fulfilling its obligations under its contracts with the State, Cigna necessarily provides extremely competitively sensitive, confidential, and proprietary data to the State. (*Id.* at ¶ 4). The Confidential Information includes the Protected Health Information ("PHI") (as such term is defined and protected by the Health Insurance Portability and Accountability Act of 1996, as amended, and its implementing regulations) (collectively, "HIPAA") of individuals covered by the State's employee benefit plans. (*Id.* at ¶ 5). The Confidential Information also includes Cigna's proprietary, commercially sensitive, and trade secret information, the protection of which is vital to Cigna maintaining a competitive position in the health plan administration marketplace. (*Id.* at ¶ 6).

A prime example of Confidential Information Cigna provides to the State is the "allowable amount" Cigna pays to specific healthcare providers based on private contract negotiations. (*Id.* at ¶ 7). The "allowable amount" shows incredibly sensitive business information because it displays what Cigna pays to specific providers for services furnished to a Cigna member. (*Id.* at ¶ 7). No reasonable business would ever disclose this information to the public, because it could be used by actual or potential competitors to improperly collude on prices and other metrics of

3

competition and to improperly compete, as well as by providers to collude to drive up their cost for services or reduce quality, scope, or quantity of services. (*Id*. at ¶ 8).

However, pursuant to its contracts with the State to administer its health benefit plans, Cigna must disclose the aforementioned Confidential Information to the State. (*Id.* at ¶ 4). Cigna's contract with the State contains provisions protecting Cigna's Confidential Information from disclosure to third parties. Cigna goes to great lengths to protect its Confidential Information, including but not limited to executing non-disclosure agreements that ensure that this information does not reach those who would use it for anticompetitive or illicit purposes. (*Id*. at ¶ 13). Along with this, Cigna repeatedly has fought against subpoenas that seek this Confidential Information, even if the information only would be disseminated to a limited number of individuals. (*Id*. at ¶ 13).

Daniel has requested Cigna's Confidential Information, and the State Employee Defendants have agreed to produce it to him, agreeing with Daniel that they will produce the requested Cigna Confidential Information on or about December 16, 2019. (*Id.* at ¶ 9). Cigna and others have urged the State Employee Defendants not to disclose the Confidential Information because of the damage it will do to Cigna, the healthcare marketplace, and the public. (*Id.* at ¶ 9). Unfortunately, the State has indicated it still intends to make the disclosure. (*Id.* at ¶ 9).

The States imminent disclosure of Confidential Information to Daniel is likely to include Cigna Confidential Information regarding, among other things, how much healthcare providers have charged Tennessee state employees and their families for services provided to them, the amount the provider is contractually entitled to receive from Cigna (the "allowable amount"), the portion of the allowable amount for which the patient is responsible as a deductible or cost-sharing obligation, the portion of the allowable amount paid by Cigna on behalf of the State, along with

4

information regarding when payments were made, the services provided, the provider treating the patient, where the services occurred, the patient's diagnosis and related codes (*i.e.*, for claims submissions), along with legions of other data. (*Id.* at ¶ 10).

The Court should enjoin this disclosure of Confidential Information because the arrangement between the State Employee Defendants and Daniel is an agreement in restraint of trade in violation of the Sherman Act, and the disclosure would independently constitute an anticompetitive exchange of competitively sensitive information in violation of the Sherman Act as well as violate Cigna's rights under the Fifth Amendment. Cigna has a strong likelihood of success on the merits.

Additionally, the risk of irreparable harm to Cigna from the disclosure is acute and apparent. The disclosure of this Confidential Information, particularly the "allowable amount," will allow providers access to information regarding how much other providers are paid. (*Id.* at ¶ 11-12). This will permit providers to collude on prices and other metrics of competition, such as quality, scope, or amount of service in the markets for healthcare services, resulting in higher prices and lower quality that will harm Cigna and other payors, including the State, other employer-sponsored group health plans, and consumers. (*Id.* at ¶ 11-12). Also, the disclosure will allow actual and potential competitors of Cigna to collude in the same manner based on Cigna's information, as well as affording them an illegitimate opportunity to alter their bids against Cigna and disadvantage Cigna's market position. (*Id.* at ¶ 11-12). Because the "allowed amount" is the same for Cigna's State account as it is for non-State accounts, the anticompetitive harms described above will extend to other adjacent healthcare markets, including but not limited to the private health plan market. (*Id.* at ¶ 11-12, 15-17).

5

Case 3:19-cv-01118   Document 3   Filed 12/13/19   Page 5 of 16 PageID #: 35

Accordingly, Cigna's claims under the Sherman Act and the Fifth Amendment are likely to succeed on the merits. And while the risk of irreparable harm to Cigna, competition, and consumers from the disclosure is enormous, the risk of harm to the State Employee Defendants or anyone else from the injunction would be negligible (if any at all). An injunction would simply preserve the status quo and maintain the healthcare market in its current, un-restrained position. Finally, the public interest strongly favors the injunction. The disclosure of the Confidential Information will likely restrict competition in the relevant market and result in higher prices and/or lower quality, scope, and amount of services for the State, other payors (including other self-funded group health plans), individual insureds, and other consumers. All four factors thus strongly favor the issuance of a temporary restraining order here.

## II. ARGUMENT

### A. Legal Standard

A temporary restraining order may be issued with or without notice to an adverse party for up to fourteen days. FED. R. CIV. P. 65. Courts employ a well-settled four-factor test to determine if this injunctive relief should be permitted:

(1) The likelihood of success on the merits on at least one claim;

(2) The threat of irreparable harm to the plaintiff in the absence of preliminary relief;

(3) Whether the injunction would cause substantial harm to others; and

(4) The public interest.

*See Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012); *Tumblebus, Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005). These factors are of course not applied in a "check the box" fashion, rather they are "interrelated considerations that must be balanced together." *Northeast Ohio Coalition for Homeless and Service Employees v. Blackwell*, 467 F.3d 999, 1009 (6th Cir.

2006) (citation omitted). While each analysis is different based on the particular circumstances, generally the amount of "likelihood of success" that the plaintiff must show is "inversely proportional" to the amount of irreparable injury that must be shown. *See id*; *Advocacy & Res. Corp. v. United States Dep't of Agric.*, 2011 WL 4738250, at *5 (M.D. Tenn. Oct. 6, 2011). That is, the greater the risk of irreparable harm, the less certainty of success the plaintiff must provide to the Court. *See id.*

Additionally, plaintiffs need not show likelihood of success on the merits as to all claims or all defendants. *See e.g. Woods v. Lynch*, 2016 WL 7192151, at *3 (W.D. Tenn. Dec. 12, 2016) ("Plaintiffs have shown a likelihood of success on the merits of at least one of their claims."); *see also Nat'l City Corp. v. Boyd*, 2008 WL 4346444, at *5 (N.D. Ohio Sept. 17, 2008).

Here, all of the factors weigh strongly in favor of granting Cigna injunctive relief.

**B.** **Each of the Factors Weighs Strongly in Favor of Cigna**

    **1.** **Cigna is Likely to Succeed on the Merits**

Consistent with this Complaint being brought pursuant to the *Ex Parte Young* doctrine, this Motion only seeks to prevent one, discrete event: the disclosure of Cigna's Confidential Information on or about December 16, 2019, by the State Employee Defendants. This act, the disclosure of Cigna's Confidential Information, would be part of a clear, ongoing Sherman Act violation and a clear violation of Cigna's rights under the Fifth Amendment, as applied to the states through the Fourteenth Amendment.

Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. The Supreme Court has interpreted Section 1 to bar "unreasonable restraints of trade." *Nat'l Collegiate Athletic Ass'n v.*

7

*Board of Regents of Univ. of Okla.*, 468 U.S. 85, 98 (1984). The exchange of competitively sensitive information among competitors can independently constitute a violation of Section 1 if it leads to anticompetitive effect. *See,* e.g*., United States v. United States Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) ("Exchanges of current price information, of course, have the greatest potential for generating anticompetitive effects and although not per se unlawful have consistently been held to violate the Sherman Act."); *United States v. Container Corp. of Am.*, 393 U.S. 333, 335 (1969). Courts in the Sixth Circuit have adopted this framework. *See*, e.g., *NorthStar Energy LLC v. Encana Corp.*, No. 1:13-cv-200, 2014 WL 5343423, at *11 (W.D. Mich. Mar. 10, 2014) (*citing Continental Cablevision of Ohio, Inc. v. Am. Elec. Power Co.*, 715 F.2d 1115, 1118-1119 (6th Cir. 1983) and *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001)). Courts generally consider "the structure of the industry involved and the nature of the information exchanged" in determining whether the information exchange is anticompetitive. *Gypsum*, 438 U.S. at 441 n.16.

Here, the structure of the industry is especially susceptible to tacit collusion, which is enabled by the availability of the type of information being disclosed here. Commentators, competition scholars, and the Federal Trade Commission ("FTC") have long identified healthcare markets as ones that are especially susceptible to tacit collusive conduct. *See generally*, Susan DeSanti & Ernest Nagata, *Competitor Communications: Facilitating Practices or Invitations to Collude? An Application of Theories to Proposed Horizontal Agreements Submitted for Antirust Review*, 63 ANTITRUST L.J. 93 (1994); *see also* Boston Decl. Ex. A. (discussed *infra*).

In addition, the type of information being disclosed, including but not limited to the granular price information contained in the "allowable amounts" and details about the services provided, will enable providers and insurers to coordinate their prices, leading to higher prices and/or coordinate to lower quality and to reduce the scope and quantity of services, which

8

constitute anticompetitive effect. This is supported by the Supreme Court's holding in *Gypsum*: "Exchanges of current price information, of course, have the greatest potential for generating anticompetitive effects and although not per se unlawful have consistently been held to violate the Sherman Act." 438 U.S. at 441 n.16.

The disclosure here will also have additional anticompetitive effects, including impediment of effective competition by Cigna and chilling of vigorous competition for the State's business, which may lead to reduced output.

*NorthStar* is instructive. The court there held: "NorthStar alleges that Encana and Chesapeake exchanged information about their current leasing activities, short-term and long-term strategies, market impacts, and strategies for the state lease sale in October 2010. These allegations, if taken as true, would have an anticompetitive effect and thus could support a Sherman Act violation claim." 2014 WL 5343423, at *12.

Similarly, here, the disclosure of Cigna's Confidential Information, including but not limited to the granular price information contained in the "allowable amounts" and details about the services provided, constitutes a state-compelled and one-sided "exchange" of competitively sensitive information in several healthcare markets, including the upstream markets for the supply of healthcare products and services. The disclosure will cause the anticompetitive effects previously described (including both coordination on prices and quality, and impediment of effective competition by Cigna and chilling of vigorous competition for the State's business). Therefore, the disclosure itself constitutes an independent violation of Section 1.

The Federal Trade Commission, the independent, federal agency charged with maintaining competition and safeguarding the interests of consumers, has recognized that the forced disclosure of competitively sensitive business data to the public is highly anti-competitive in healthcare

markets. In 2015, the FTC wrote a lengthy letter to two Minnesota House of Representatives members, who were involved in the consideration of a law that would have potentially required public health plans administering healthcare coverage in Minnesota to disclose "competitively sensitive information, including information related to price and cost."

In that 2015 letter, the FTC discussed, in detail, the two primary harms that come from the public release of this type of competitively sensitive data: one, it permits improper collusion and chilled competition, and, two, it drives up cost.

As laid out in the letter, if competitively sensitive information related to how much companies like Cigna pay providers is made public, that information can then be used by providers (who now see what others are getting paid) to demand higher prices for their services and to undermine the effectiveness of selective contracting by health plans. This drives up cost for companies like Cigna, for the State, and ultimately for the consumers as well -- it is a ripple effect.

Second, public disclosure of private, health plan company information chills competition by facilitating unlawful collusion among competitors, including both competing health plans and other providers of healthcare services. Such collusion extends to several aspects of competition, including prices and quality of services or products, and extends to several healthcare markets involving the Confidential Information. The FTC has confirmed that these unchecked, unregulated disclosures of private Confidential Information like the State Employee Defendants have agreed to provide to Daniel occur outside the "antitrust safety zone." In short, there is no reasonable question that "public disclosure of [healthcare market] information could reduce competition and increase prices to consumers," as well as facilitate collusion and other conduct that harms competition in the healthcare markets.

Another way that such disclosure can harm competition is that it will disincentivize Cigna and other market participants from competing vigorously for the State's business, which can reduce output and harm payors and consumers. This is also one of the harms recognized by the FTC.

The FTC letter from four years ago confirms what the Supreme Court held 50 years ago -- improper and unauthorized exchange of competitively sensitive information facilitates collusion and may violate Section 1 of the Sherman Act. *See, e.g.*, *United States v. Container Corp. of Am.*, 393 U.S. 333, 335 (1969). Again, here, the anticompetitive effect from this restraint of trade is obvious, as described above.

Accordingly, there are clear, unreasonable anti-competitive restraints at work here, with no countervailing benefit or any minimal procompetitive benefit is outweighed by the anticompetitive harms. Cigna has a strong likelihood of success on its Section 1 of the Sherman Act claim.

While the likelihood of success on the Sherman Act claim is sufficient to credit Cigna on this element, Cigna also has a strong likelihood of success on its Fifth Amendment, takings clause claim. As stated in the Declaration of Mr. Ungs, some of the information that the State Employee Defendants have agreed to disclose -- most particularly the "allowable amount" information -- is a trade secret under Tennessee law. *ProductiveMD, LLC v. 4UMD, LLC*, 821 F. Supp. 2d 955, 961 (quoting T.C.A. 47-25-1702(4) (a trade secret is "information, without regard to form, including, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process, or plan that: (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and (B) Is the subject of efforts that are reasonable under the circumstances to maintain its

secrecy."). The amount that Cigna pays to providers for services rendered to patients under the contract with the State, which Cigna provided to the State pursuant to the contract (and which are protected from disclosure by the contract itself) has obvious and recognized independent economic value from not being generally known; indeed, it a principal source of Cigna's competitive position in the marketplace.

It has long been recognized that, under the Fifth Amendment applied to the states through the Fourteenth Amendment, the government may not take property without due process and just compensation. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002-04 (1984). And the Supreme Court has recognized that business trade secrets are property that the government may not take without just compensation and due process. *Id.* Here, the State Employee Defendants intend to disseminate to the public Cigna's private property (its trade secrets) without due process or just compensation. This is a clear and improper "taking" under the Fifth Amendment, and, therefore, Cigna has a likelihood of success on this claim as well.[2]

### 2. Cigna Will Suffer Irreparable Harm From the Disclosure.

Once Cigna's Confidential Information is disclosed, the damage will have been done. *In re Professionals Direct Ins. Co.*, 578 F.3d 432, 438 (6th Cir. 2009) ("a court cannot restore confidentiality to documents after they are disclosed"). There is no way to un-ring the bell. Confidential Information, particularly regarding allowable amounts, that Cigna has developed through its own business experience and acumen will now be in the public domain, and actual and potential competitors could use that information to reverse engineer Cigna's business model (including price discounts and competitive bids), and alter their competitive strategies based on

---

[2] Cigna is not seeking any "just compensation" from the taking in this lawsuit. It is, rather, pursuing a claim for prospective, equitable relief under *Ex Parte Young*.

12

Case 3:19-cv-01118   Document 3   Filed 12/13/19   Page 12 of 16 PageID #: 42

the information to Cigna's disadvantage rather than compete on the merits. And, as stated above, providers will able to use that information to collectively set higher prices or reduce their quality, scope, and quantity of services, resulting in higher costs for Cigna. More importantly, market participants, including both Cigna's competitors and other providers, will likely use the Confidential Information to collude on prices on other metrics of competition in the various healthcare markets, thus harming competition, payors, and consumers. Once this train is out of the station, it cannot be stopped. The information cannot be clawed back, unlearned, or unseen. A clearer case of irreparable harm can hardly be envisioned.

The FTC has recognized and forecasted the damage that can come from the disclosure of this brand of confidential information. And, the case law is legion establishing that the disclosure of confidential information and trade secrets "constitutes irreparable harm sufficient for the issuance of an injunction." *Experian Mktg. Solutions, Inc. v. Lehman*, 2015 WL 3796240, at *11 (W.D. Mich. June 18, 2015) (citing *Henkel Corp v. Cox*, 386 F. Supp. 2d 898, 904 (E.D. Mich 2005); *Invacare Corp. v. Nordquist*, 2018 WL 2454523, at *7 (N.D. Ohio June 1, 2018) ("courts have recognized that injunctive relief is appropriate when the disclosure of confidential or trade secret information might lead to difficult-to-measure damage"); *PartyLite Gifts, Inc. v. Swiss Colony Occasions*, 2006 WL 2370338, at *8 (E.D. Tenn. Aug. 15, 2006) (internal quotation omitted) ("Where confidential information would be extremely useful to competitors disclosure of that information may constitute irreparable harm.").

The risk of irreparable harm is acute here. To the extent the Court has any concerns about the likelihood of success on the merits, the Court may recall the "inverse relationship" between likelihood of success and irreparable harm. The risk of irreparable harm here could scarcely be higher. The second factor strongly and compellingly favors the issuance of an injunction.

13

### 3. Defendants and Others Would Suffer No Harm From The Injunction, Let Alone "Substantial Harm."

The third factor explores whether the Defendants or others would suffer harm from the injunction. *Bays,* 668 F.3d at 819. The answer to this one is straightforward -- no. The State Employee Defendants have agreed to produce Cigna's Confidential Information pursuant to a purported Open Records Law request. There is absolutely no harm or injury that can or would come to them if the injunction is entered. If an injunction is issued, they will simply not furnish a wealth of Confidential Information to Daniel, whose request arises under dubious circumstances. There will be absolutely no injury or loss to the State Employee Defendants -- or anyone else -- from not disclosing this information immediately. Little more need to be said on this third factor because the answer is so clear. This factor clearly and strongly favors the issuance of an injunction.

### 4. The Public Interest is Served by an Injunction.

The public interest is plainly served by the issuance of an injunction. First, the public interest is served when the integrity of the Confidential Information that a party has worked to generate and maintain is kept secret. *See Fid. Brokerage Servs. LLC v. Busch*, 2014 WL 902722, at *1 (E.D. Mich. Mar. 7, 2014) ("[t]he issuance of injunctive relief will serve the public interest in the protection of proprietary business and customer information and [Plaintiff's] trade secret information, as well as by safeguarding [Plaintiff's] customer personal information.") Second, as the FTC has indicated, there is a substantial risk to the public from the improper disclosure of competitively sensitive information, such as health insurance information and the type of Confidential Information here, because it encourages collusion, which harms competition and consumers in several healthcare markets in the form of higher prices and/or lower quality, scope and quantity of services. No public interest is served by publicizing this type of competitively sensitive data.

To review, the public disclosure of the data (particularly the allowable amount) will harm competition and consumers by: (a) facilitating collusion by providers in healthcare markets to raise prices and/or reduce quality, scope, and quantity of services; (b) facilitating collusion by Cigna's competitors in the health plan administration market and adjacent health plan markets on prices and other metrics of competition; (c) enabling Cigna's actual and potential competitors to alter their bids based on the Confidential Information to disadvantage Cigna and impede effective competition from Cigna, rather than compete on the merits; and (d) disincentivizing Cigna and its competitors from vigorously competing for the State's business, which may reduce output. Finally, it will also undermine the trust of providers who negotiate rates for services with BCBST in a confidential environment. The public interest will strongly benefit from an injunction, and this factor thus favors Cigna as well.

### III. CONCLUSION

All four factors strongly favor Cigna, and therefore Cigna respectfully requests that the Court enter an temporary restraining order under Federal Rule of Civil Procedure 65 that will enjoin the State Employee Defendants from disclosing Cigna's Confidential Information to Daniel pending further order of the Court.

15

Case 3:19-cv-01118   Document 3   Filed 12/13/19   Page 15 of 16 PageID #: 45

Respectfully submitted,

/s/ Erin Palmer Polly
Erin Palmer Polly (#22221)
erin.polly@butlersnow.com
Gibeault C. Creson (#32049)
beau.creson@butlersnow.com
Butler Snow LLP
The Pinnacle at Symphony Place
150 Third Avenue South, Suite 1600
Nashville, Tennessee 37201
(615) 651-6700
(615) 651-6701

*Plaintiff CIGNA Health and Life Insurance Company*

50526013.v1